The NEW-HAVEN AND EAST-HAVEN TOLL BRIDGE COMPANY
*against* BUNNEL and another :

IN ERROR.

In 1796, the legislature incorporated a company for the purpose of erecting a bridge, with the privilege of collecting certain rates of toll, for seventy years ; and provided, in the act of incorporation, that the bridge should have a draw in some convenient place in the channel, at least twenty-six feet wide, to admit the passage of vessels ; that, during the term specified, the company should keep the bridge in good repair, subject to the inspection of the general assembly ; and that the grant should not operate to injure the property or privileges of individuals. By an act passed in 1820, the legislature directed the company to open the draw of the bridge for the passage of any vessel, on reasonable notice, (which was prescribed) free of expense to the owners ; and subjected the company, for non-compliance, to three-fold damages. Held, that under the act of incorporation, it was the duty of the company to make and keep in repair a draw fitted for the passage of vessels, and, on due notice, to open it, for this purpose, without delay ; and that, by virtue of the power reserved, it was competent for the legislature to enforce performance of such duty, by the provisions of the act of 1820.

This was an action on the case, brought by *Bunnel* and *Seely,* against *The New-Haven and East-Haven Toll Bridge Company,* for the neglect of the latter to open the draw of their bridge, and to permit the plaintiffs' vessel to pass through ; demanding three-fold damages.

The action was founded on two acts or resolves of the General Assembly, one passed in *October*, 1796, incorporating the company, the other passed in *May*, 1820, which were set forth in the declaration.

The former, after granting liberty to the petitioners to erect a bridge at the place specified, and to collect thereat certain rates of toll, contained the following provisions: "Which said toll may be collected by said inhabitants of *East-Haven*, (the petitioners) or their assigns, and for their use and benefit, for the term of seventy years from and after the time fixed in this resolve for erecting and completing said bridge to the acceptance of the General Assembly, or a committee to be by them appointed for that purpose; and after the expiration of said term of seventy years, no more toll shall be collected than the General Assembly shall then adjudge and determine to be sufficient to keep said bridge in repair, and shall be appropriated to that use." "Which said bridge so to be erected shall not be less than 27 feet wide, and as great a proportion as one half thereof built solid, with stone, sand and earth; and shall have a draw in some convenient place in the channel, at least 26 feet wide, to admit the passage of vessels, and shall be completed within the term of two years from the rising of the General Assembly in *May*, 1797, or, on failure thereof, this grant shall be null and void." "And during said term of seventy years, said company shall keep said bridge in good repair, subject to the inspection of the General Assembly, as often as they shall think proper, by their committee to be appointed for that purpose." "Always provided, that nothing in this grant shall operate to injure or affect the property of any individual, or of the proprietors of common and undivided lands in *New-Haven*; but the property and privileges of individuals and said proprietors, are hereby saved."

The resolve of *May*, 1820, was as follows: "Upon the petition of *Daniel Rowe*, *Elijah Rowe*, *Heman Hotchkiss* and *James Barnes*, showing to this Assembly, that by the act of the Assembly authorizing a bridge across the north part of *New-Haven* harbour, at a place called *Leavenworth's* ferry, leading from *New-Haven* to *East-Haven*, and incorporating the company to build and keep the same in repair, it is provided, that there should be a draw in some convenient place in the channel, at least 26 feet wide, to admit the passage of vessels, and praying this Assembly to order and direct the

said company owning said bridge to make and keep in good repair at some convenient place in the channel of said river, a good and convenient draw to admit the easy and free passage of such vessels as may have occasion to pass up and down said river; and that said company be ordered and compelled to open said draw for the passage of any vessel, on reasonable notice, free of expense to the owners thereof; as by petition on file : *Resolved by this Assembly,* that it shall be the duty of the company owning said bridge to make and keep in good repair, at some convenient place, in the channel of said river, a good and convenient draw, to admit the easy and free passage of such vessels as may have occasion to pass up and down said river, the same to be done and completed to the acceptance of commissioners hereinafter named, within such time as they may limit; and it shall be the duty of said company to open said draw for the passage of any vessel, on reasonable notice, free of expense to the owners or master thereof; and when any vessel may have occasion to pass up or down said river, through said draw, the blowing of a horn or the firing of a gun shall be deemed reasonable notice, at any time between the rising of the sun and nine o'clock at night, to said company, to open said draw for the passage of said vessel through said draw; and personal notice shall be given to the keeper of the toll-gate, at any other time, for vessels to pass through said draw; and if any vessel is detained, by the neglect or refusal of said company to open said draw, for the passage thereof, upon reasonable notice as aforesaid to open the same, the owner or owners of said vessel shall recover of said company three times the amount of the damage, which the owner or owners of such vessel may sustain, by her detention, before any court proper to try the same." By another clause in this resolve, three persons were appointed commissioners to superintend the bridge. In the county court the defendants demurred to the declaration; and judgment was rendered for the plaintiffs. The defendants thereupon brought a writ of error in the superior court; which was reserved for the advice of all the Judges.

*Daggett* and *N. Smith,* for the plaintiffs in error, contended, That the act of the legislature, passed *May,* 1820, by which the company were directed to open the draw for the passage of vessels, in the manner prescribed, under the penalty of three-fold damages, was void, being opposed to common right,

to the constitution of this state, and that of the *United States.* By the terms of the original grant, the company were required to make a draw in the bridge, and to complete it within a specified time, under the penalty of forfeiting their grant; but they were not required to open it, " at the firing of a gun or the blowing of a horn," nor were they, in any event, subjected to a penalty of three-fold damages. The act of *May,* 1820, invades the rights of the company under their grant; it subjects them to new burdens, without their consent; it impairs the contract made with them. The legislature cannot even *construe* their own grant. *Const. Conn. art.* 2 and 5. *Const. U. S. art.* 1. *sect.* 10. *The Society for the propagation of the Gospel in foreign parts* v. *Wheeler* & al. 2 *Gallis.* 105. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. *Vanhorne's* lessee v. *Dorrance,* 2 *Dall.* 304. *Fletcher* v. *Peck,* 6 *Cranch* 87. *Dartmouth College* v. *Woodward,* 4 *Wheat. Rep.* 518. 562. 578. 625–7. 641–5. 654, 5. 662. 664. 675–6. 682. The right of *inspection,* reserved by the grant, related only to keeping the bridge in repair.

*Staples* and *Ingersoll,* contra, admitting that the grant in question was in the nature of a contract, and that the legislature could not deprive the company of their vested rights, insisted, That the act of *May,* 1820, did not impair the obligation of any contract, or infringe the rights of the company, but merely gave a new remedy to compel a specific performance of the original obligation on the part of the company. The provision in the act of incorporation for " a draw, in some convenient place in the channel, to admit the passage of vessels," implied, that it should be opened by the company, for this purpose. Besides, the act of incorporation *expressly saved* the privileges of individuals; and the grant is to be " subject to the inspection of the General Assembly." The act of *May,* 1820, was only the exercise of the right thus reserved, necessary for the protection of the persons, whose privileges were thus declared to be inviolable.

HOSMER, Ch. J. The General Assembly, in *October,* 1796, authorized the erection of a toll-bridge from *New-Haven* to *East-Haven,* and incorporated the defendants for that purpose, giving them the privilege of a specified toll for seventy years. The act of incorporation prescribed, that the bridge should " have a draw in some convenient place in the channel, at least

twenty-six feet wide, to admit the passage of vessels ;" and that it should be completed in two years from the rising of the General Assembly in *May*, 1797 ; and, on failure thereof, that the grant should be void. From this provision it is undeniable, that the navigation of the river, over which the bridge extended, was not to be unnecessarily impeded ; and that the company, by the acceptance of their charter, contracted to accommodate the passage of vessels, by a sufficient draw ; and so paramount was this object in the contemplation of the legislature, that the existence of the grant was suspended upon the observance of this stipulation. The act of incorporation contained this further provision, that during the term of seventy years, the company should keep the bridge in good repair, subject to the inspection of the General Assembly, as often as they should think proper, by their committee appointed for that purpose ; and that the grant should not operate to injure the property or privileges of any individual. Not unwilling to authorize the erection of a toll-bridge for the public accommodation, the General Assembly was careful to protect individuals in the enjoyment of *their* rights, and particularly, in the navigation of the river, free from every impediment, except the necessary delay of passsing through the draw.

From this concise view of the facts, certain results are indisputable. First, it is the indispensible duty of the company, to erect and keep in repair a good and sufficient draw for the general accommodation. Secondly, it was equally their duty, on due notice and request, to open the draw for the passage of vessels, and that promptly, without unnecessary delay. This proposition has been denied ; but, in my opinion, on no reasonable ground. On what principle could a stranger to the company assume on himself the management of the draw ? Over this property he has no right ; and his entry upon it, except in the usual manner, for the purpose of passage, would be totally unwarrantable. To have the management of the draw, is not only the exclusive right, but the unquestionable interest of the company, to preserve this essential part of the bridge from the maltreatment of men unaccustomed to handle it, and to prevent the unnecessary and unseasonable obstruction of the public travel. It is unreasonable even to absurdity, to hold, that strangers, at their pleasure, may intermeddle with the property of the company, and subject them to the hazard of serious injury to the draw, and a diminution of their

profits. I repeat as an indisputable principle, that it was the duty of the company, on due notice and request, to open the draw for the passage of vessels, promptly, and without unnecessary delay. To ensure this object, and to preserve the rights of persons interested from injury, the legislature considered it unwise to confide in the company without supervision. For this reason, it was made a stipulation in their charter, that they should keep the bridge in good repair, *subject to the inspection of the General Assembly.* The object of this visitorial authority is too apparent to admit of controversy. It was for the enquiry into, and prompt correction of, all abuses, practised by the company, under colour of their charter ; for directing an observance of the charter prescriptions ; and for compelling obedience to such directions. A construction, which falls short of this, must presume, that the legislative inspection, instead of usefully protecting and enforcing the rights of the public and of individuals, was intended to be nugatory and inefficient. For, of what possible advantage would it be, to supervise the conduct of the company, if the legislature had no authority to direct and compel the observance of the contract into which the company had entered ? The legislature, then, was invested with the legal power of directing the repairs of the bridge, and the opening of the draw, on a prescribed notice, and to cause such directions to be obeyed. A liberal exposition of the authority, implied from the reserved right of inspection, ought to be made, to attain the object solicitously kept in view, of protecting all persons in the enjoyment of their unquestionable rights. If it be said, that the legislature had authority, only to direct *repairs* on the bridge, we surrender the rights of individuals to the discretion of the company. Unless to direction is superadded the right of compulsion, it is *vox et prœterea nihil ;* an absurdity too palpable to be countenanced.

In *May,* 1820, the General Assembly passed an act directing the company to open the draw of the bridge for the passage of vessels, on reasonable notice prescribed, and subjected them to treble damages, as a means of coercing the observance of this duty. Waiving a consideration of the objections made to retrospective laws, as being entirely unnecessary, I am of opinion that this act was fully warranted, by the charter of incorporation, and is merely co-extensive with the reserved authority of inspection. The legislature had retained the right of deciding whether the company acted up to the

New-Haven, July, 1821.

Bridge Co. v. Bunnel.

contract implied from the charter of incorporation accepted by them—of *directing* the performance of their obligations, and of *enforcing* the observance of the directions given. This they have done, by the act of *May,* 1820, and this only, in a manner perfectly unexceptionable. Instead of pointing their directions to the performance of a particular act, on a special occasion, they have been induced, by the non-compliance of the company with their agreement in relation to one branch of their duty, to prescribe a general rule, and to secure its observance, by a penalty. In doing this, they were justified, by the reason and spirit of the charter incorporating the company ; and the only question, in my mind, is, why such a measure should have been necessary.

To this result I have come, with the most perfect conviction of its solidity. If the legislature is not authorized to direct and compel the opening of the draw, in a manner adequate to the attainment of the object, the inspection reserved in the charter of incorporation is delusive ; and the rights of individuals, solicitously intended to be secured, by that measure, are virtually left to expensive and vexatious litigation, or to the mercy of the company.

For these reasons I am of opinion that the declaration is sufficient ; and that the judgment of the county court ought to be affirmed.

The other Judges were of the same opinion, except BRAIN-ARD, J., who was absent.

Judgment to be affirmed.