## SUITABILITY OF DRAW BRIDGE OVER NAVIGABLE STREAM.

Circuit Court of Ashtabula County.

STATE OF OHIO, EX REL RUSSELL C. HUMPHREY, v. THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY.

Decided, March 23, 1901.

*Bridges—Waters—Hand Draw in Bridge Over Navigable Stream Not Reasonable—Jurisdiction—State Courts Have Jurisdiction Over Navigable Waters Entirely Within State—Suitability of Draw a Question for the Court.*

1. A draw bridge which is operated by hand and which requires the efforts of thirty men to move it, resulting in long delays for vessels seeking to pass it, is not a compliance with a decree ordering the construction of a "suitable" draw bridge at that point.

2. Until the United States assumes jurisdiction over navigable waters wholly within a state, the state has jurisdiction over them and the state courts may make and enforce decrees regarding the use of them.

3. The fact that plans for a draw bridge were approved by the Secretary of War and by the state board of public works, does not prevent the court from requiring a different motive power from that supplied, where the plans submitted and approved did not disclose the motive power for moving the draw.

4. The suitability of a draw in a bridge over a navigable stream is for the court to determine.

*Goulder & Holding* and *Burton & Dake,* for plaintiff.
*Brewer, Cook & McGowan* and *Judge Green,* contra.

CALDWELL, J.; HALE, J., and MARVIN J., concur.

An action was brought in this court by the plaintiff against
the defendant to require the defendant to remove a bridge that
it had and was occupying over the navigable waters at Ashtabula
Harbor.

In that case the question was tried as to whether the waters
were navigable or not and to what extent. This court decreed
in that case that the waters were navigable above the bridge
and that the bridge interfered with the navigation of waters,
and ordered the bridge to be removed and left it to the option of
the railway company to either build its bridge above the naviga-.
ble waters of the river or to build where the one then existing
was, with a suitable draw in the bridge. That case was carried
to the Supreme Court of this state by the defendant, in which
court this court was affirmed, and the defendant then carried
the case to the Supreme Court of the United States, where the
courts of this state were affirmed.

The railroad company thereafter proceeded to build the bridge
in question. The evidence shows that they found a bridge that
had been constructed for other parties and for a different place,
and bought that bridge; that the bridge was 360 feet long and,
by putting the pier on one side of the channel, it left an arm
to be operated over the channel of the river substantially 180
feet long. While it seems to us that that length of bridge was
entirely unnecessary for this place and especially for the present
uses, yet we are not called upon to condemn the same for that
reason, nor could we do so, for the railroad company had a right
to anticipate a growth of business and future conditions of the
harbor.

This action is now brought by way of proceedings in contempt
against the railroad company for having at Ashtabula Harbor a
bridge with a draw that can not be operated by the means em-
ployed by the railroad, without much interference with vessels
passing through the same, and much injury to those abutting
upon the navigable waters of the stream above the bridge; and

it is sought in this proceeding to have the court take such measures as to carry out the purpose and intent of the decree that was entered in the former action, and compel the railroad company to comply with the intent and purpose of that decree.

Before the railroad company built the bridge in question, it submitted plans of the bridge to the Secretary of War, which plans he approved; and it submitted also to the board of public works of the state of Ohio the same plans, which plans were approved by that board. It is contended by the defendant that, having built according to the plans submitted to the Secretary of War and the board of public works of Ohio, that the jurisdiction of this court to take such proceeding as are asked for in this action, is entirely wanting. It is contended that the proceedings between the defendant and the board of public works was in form and was in fact a contract; that the board of public works representing the state of Ohio in matters of public improvements, it amounts to a contract between the state of Ohio and the defendant, which settles and determines the question now before the court, and, if it does not strictly comply with the decree made by this court, still it was a contract that the state had a right to make and if it did make it *this* court is without jurisdiction to proceed in the matter.

Various other questions are raised, which I will notice in their order.

In the first place, the defendant claims that it has furnished a proper and suitable draw.

This involves the question as to what is a proper and suitable draw. It may relate to the mechanical construction of the bridge itself; or that term may be used to include also the machinery and means of moving the bridge—of opening and closing the same. Certainly a bridge with the necessary structure, so far as the bridge, strictly speaking, is concerned, may have what may be called a *suitable draw* and yet be entirely useless as a *draw bridge* unless there is some means of opening and closing the same. A bridge of this size, 360 feet long, to be of any use at all, by way of keeping the channel over which it is built open for craft navigating the waters, must have some means of opening and closing the same.

The railroad company claims that it has furnished a bridge that, when swung, will clear the channel of the stream, and a bridge with a draw which can be operated by the application of ordinary motive power of hand or otherwise; and that they have furnished a draw which can be opened within a reasonable time; and that, having submitted these plans to the Secretary of War and to the board of public works of the state of Ohio, it has fully complied with the requirement of the decree and of the requirements of the United States Government and of the state government.

The evidence shows that one man was kept upon the bridge as a draw-tender and a draw-watchman; that when a boat whistled for the bridge, it became his duty to go to where the section-men were working in the yards of the company, which yards extended from the bridge, one mile away, and secure the section-men for the purpose of opening the bridge; if the men happened to be near at hand, the time was shorter than when they were far away; sometimes they might be near enough to be called by the person on the bridge without his going out after them; but this method of operating the bridge caused delay at all times very unusual and unreasonable. The evidence shows that sometimes the bridge was not opened at all and boats were unable to pass through, and sometimes boats, tired of waiting, or unwilling to wait the length of time necessary to get the bridge open, turned about and went away. The evidence shows that the present mode, adopted for the last five years, of moving a bridge of this size, is by steam-power or by electricity, and not by hand; and the evidence shows that it would require a sixteen-horse-power engine to handle the bridge in proper manner, and that that size engine would be light for the work. The evidence shows that it would require at least thirty men to do the work with rapidity and certainty.

The evidence conclusively shows that the railroad company has at no time since it built the bridge used upon it the requisite power nor the facility in way of number of men, or time of getting the men there, to make the bridge of any practical use to those desiring to use the river above the bridge.

The only excuse the railroad makes for not using steam-power, or some other artificial power, for opening and closing the bridge, or the requisite number of men for doing it rapidly and easily, and for not having the men present at the bridge ready to open it at any time, is that the bridge is so seldom called for by any boat, that it would be a needless expense upon the defendant and that the emergency of the case does not require it.

If the railroad company should continue to operate the bridge as it has been doing, undoubtedly the demand for the bridge to swing would never be increased, for the delay is such that it is of no practical use to those desiring to use the waters above the bridge.

There is no material differences between this argument and the one that might have been used in the former suit. In the former suit it might have been said that whenever the relator and others owning property above the bridge, establish a business that demands a swing-bridge, then they would put one in.

The bridge, as it has been operated, practically prohibits business being introduced above the bridge; and it seems to us unreasonable and of no weight whatever for the railroad to say that when the relator and others establish business on the waters above the bridge, that calls for service, then they will give them that service, but that, until they have thus established business, the present service is all that is necessary; whereas, it is clear that with the present service there never will or can be a business of any consequence established above the bridge and hence the relator and others could never make any use of their property for which it is best adapted.

But it is said that these plans, having been submitted to the Secretary of War and the board of public improvements and and being approved, this court has no jurisdiction to now consider the sufficiency and adaptability of this bridge. The evidence in the case shows, however, that the mode and manner of opening and closing the bridge was never exhibited to those authorities by any drawings or in any other manner. The kind of machinery used to operate the draw was not submitted to them, nor was there submitted to them the kind and amount of power to be used.

But it is said that the decree pointed out nothing except a *suitable bridge,* and the decree not having declared what that suitable bridge should be, and it being shown that the bridge itself is suitable, that this court has now no authority to enforce any part of its decree because the decree has been wholly complied with.

If this proposition is true, then the railroad company might have built the bridge as it now is, without any machinery to open and close it; and without power to be used for that purpose, and it might be said that the decree had been wholly complied with, and yet the bridge, so completed, would be substantially the same kind of a bridge that the court required to be removed.

It is evident that the decree, when it says "suitable," *means* a bridge complete in all its parts and one that has upon it the necessary equipment and machinery for opening and closing the same to traffic, as such bridges are usually opened and closed. If this decree, then, means what we think it does, then it is within the jurisdiction of this court, so far as the limits of the decree go, to not only enforce the building of the structure, but the equipping it for opening and closing within that reasonable time that is common in other bridges.

It is said that this is not the proper proceeding to take in this case. That if any of the parties living south of the bridge have been injured by the way in which the bridge has been operated, their action is for damages; that we are not called upon by such parties to act except as they may call upon us through the state by means of the proper officer of the state.

The state is interested. It is a matter pertaining to the interests of the state; it is a matter directly over which the state has control; and besides, if it had been simply the individual, Mr. Humphrey, who was making this application, if he could make it at all, there would be open to him *three* remedies; he could proceed by way of indictment, or he could proceed by way of having the nuisance abated, or he could proceed for damages.

It has been held in this state and other places that under the facts and circumstances existing in *this* case, a proceeding by way of damages is inadequate. 23 O. S., 523. And we may cite many cases from other states.

There is a case in 44 O. S. which bears directly upon the question of when a party has an adequate remedy by way of damages and when he has not, which, we think, is applicable to the case before us.

If we had any authority to enter a decree in this case *in the first place,* and it has been established by the highest court in the land that we had, then we certainly have the authority to enforce that decree and can do it in an action of this kind, if we can do it at all.

There is no proof in this case, nor does such proof exist, that the United States has ever assumed jurisdiction over these waters by way of any legislation whatever, and it is the law that until it does, the state has entire, or at least concurrent, jurisdiction over the waters and her courts may proceed to decree in regard to the same and to the rights of parties therein. There has been nothing done, either by the general government or the state government since our decree, that in any way removes *our* jurisdiction over this matter. No legislation has been pointed out to us; nor, as far as we know, is there any legislation that in any way takes away the jurisdiction of the state courts over these waters. The mere approval of the plans of the bridge by the Secretary of War and the state board of improvements would not serve that purpose, nor is it intended to serve any such purpose. It is provided that such plans may be submitted to the Secretary of War, because at any time the United States may, through Congress, undertake to legislate over these particular waters, and to save parties who make improvements needless expense, it is proper and right that improvements be submitted to the Secretary of War.

The contract between the state and defendant shows on the face of it that the state did not intend to relieve the defendant from any duty resting upon it under the decree of this court. In fact, it shows to the contrary. As that contract requires of the defendant everything that we have construed the decree to require of the defendant, and if that contract were to be enforced it would have to be done through the courts, and if the decree is to be enforced *that* must be done through the court; so, certainly, the court has jurisdiction to determine *this* matter.

The defendant seems to have understood from the beginning that its method of operating the draw would be called in question; it seems to have had a suspicion that the public would not be satisfied with the way in which it was operating the draw; and such appears to be the fact from the testimony which it undertook to preserve.

That testimony was kept and presented to this court by employees of the railroad company, at the suggestion of the officers of the company. It is not in harmony with the testimony of disinterested parties who saw this bridge move at different times. The testimony in this case shows clearly, or at least the weight of it is, that the operations of this bridge were much more unsatisfactory and much more tedious than would appear from the testimony of the defendant on that subject.

The means and force heretofore used on this bridge for opening and closing it, have been unreasonable and not such as the law requires the company to maintain; and they have been so unreasonable that they have made the time of passing the bridge so uncertain that no boat, unless it was a boat owned by some one living above the bridge, would undertake to pass the same with any frequency at all, or to carry on any business or trade or traffic that would require it to pass through the bridge. It has been practical prohibition to all craft to undertake to pass through the bridge; and it is no answer for the company to say that it will give no *better* accommodations until a traffic has first been established that will warrant the necessary expenditure and outlay; nor will it do for the company to say that it is unreasonable to require it to maintain an engine and power day and night, or a large force of men on the bridge constantly, considering the amount of traffic that would pass through the bridge.

But, in saying this, the defendant judges the amount of traffic by what it has had; by what is an effectual prohibition to traffic to go above the bridge.

We believe that the railroad company might have built a bridge that would have been entirely sufficient for this place on which the draw might have been operated by hand-power by the use of two or three men, and the only reason why it may not

so operate a bridge is because it has seen fit to place there a bridge which requires a much greater force to handle; and as the railroad company has seen fit to use so large and extensive a bridge, it certainly can not complain if the courts require it to use a proper force and appliances for handling the same.

It is claimed that this court has no authority to establish any rules or regulations governing the operation or opening of the bridge in question.

The court has authority to carry out this decree, and to require the defendant to use such means as are necessary for that purpose.

Decisions are not wanting to show that it is for the courts to determine whether a draw is *suitable or not.* 2 Gray, 339; 4 Conn., 54.

The purpose of law-makers and of courts is to so regulate traffic upon the bridge and traffic upon the navigable waters, that they shall interfere with each other as little as possible. The state may determine in its legislative capacity, that one is of so much greater importance than the other, on account of the quantity and volume of business, that the lesser shall give way entirely to the greater; and the private individual who is damaged by such action on the part of the state, may have no cause of action for damages; but we apprehend that the courts have no authority to say that, because the traffic of defendant over its bridge is very large and that upon the water is small, therefore that upon the water should yield to that upon the bridge. This reasoning would lead to keeping the traffic upon the water at a minimum, and the traffic upon the bridge at a maximum, greatly to the injury of the public, and it has been the law, and is today, that no one has a right to obstruct or materially impede the use of navigable waters for the commerce for which they are adapted.

The court, therefore, is unable in this case, in following the law, to adopt the ideas of the defendant that it is under obligation to afford only such privileges and opportunities for passing through its bridge as the size of the commerce may demand.

The railroad company has, in a measure, tried to comply with the decree, and insists that it *has* complied with the same in

good faith so far as, in its opinion, it believed it was under obligations to comply.

The kind of service it has given to boats passing its bridge, it contends, is all that the *law* of the decree required of it, and that in every way it has acted in good faith.

The court is inclined to give the company credit for acting in good faith and not designedly refusing to carry out the decree of this court. Nevertheless, what it has done does not satisfy the law of the case nor the law intended to be imposed upon the defendant by the decree, and which we believe the decree does impose upon it.

Having, therefore, determined this much, it would, perhaps, be unjust at this time to proceed to punish the defendant for a failure to comply with the decree of the court, when the decree itself does not point out definitely what the defendant is to do by way of specifying wherein and to what extent it must afford lawful privileges to those navigating the waters under its bridge. The means to be adopted to comply with the law of the decree were left wholly to the company. If it adopted means that could not accomplish the end required of it, it would afford no excuse in law for not doing anything more, but it might be some excuse for its action so that it would be unjust, when it had done what it has in good faith—believing that it had fully complied—to punish it, as would be done in case of a refusal to comply at all.

Under such circumstances, in an action of this kind, it is within the authority of the court and, we believe, within the duty of the court, to point out to the defendant wherein it has not complied with the decree of the court, and give to it a further opportunity and require that by a time named it shall comply with the decree as understood by the court and, if not, then the excuse now offered can no longer be plead by the defendant.

We, therefore, say to the defendant, that it is its duty by the decree to furnish a draw-bridge for that place, such as is customary over navigable waters. That means that it shall have a suitable draw and machinery and power necessary for operating the same, as such bridges are usually operated, and, under the testimony in the case, that power should be such that this bridge can be opened within seven minutes from the time it gets the

signal from the boat. In fixing the time, we believe that we have given the railroad company a full length of time usual for bridges situated under like circumstances of this bridge.

We will not say that the power to be used shall be steam or electricity, although the evidence shows, without contradiction, that the power usual on bridges of this size, adopted within the last five years, is steam or electricity.

Under the circumstances, we believe that the railroad company should have the privilege of moving this bridge by hand-power providing sufficient men are used to have the bridge opened within seven minutes from the time the signal from the boat is given. This can not be done, according to the evidence, in the method which has been adopted by the railroad company.

The matter of sending for help at quite a distance from the bridge, and giving time for the help to get there, is not sufficient and does not comply with the law of the case.

Accepting the plea of the defendant that it has acted in good faith, believing that it was complying with the decree of the court, and having pointed out more definitely than the decree does, what is required of the defendant to fully comply with the decree, we give the defendant a further opportunity to comply with the terms of the decree as herein construed, and we will postpone this case until the 13th day of May, 1901, to give the defendant an opportunity to perform the duties imposed upon it by the decree as construed by the court, and, if it has not by that time so complied, we will further consider what is to be done in this case.